UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WUZI JIAO, *on his own behalf and on behalf*
*of others similarly situated*,

                    Plaintiff,

      -against-

KITAKU JAPANESE RESTAURANT, INC.,
d/b/a Kitaku; GIN KITAKU, INC., d/b/a Kitaku;
YUKI KITAKU, INC., d/b/a Kitaku; SPRING
KITAKU, INC., d/b/a Kitaku; LUNA CUISINE,
INC., d/b/a Kitaku, d/b/a Rice K; RICE K, INC.,
d/b/a Rice K; YI GIN CHIN, XIU CHEN; and
SIU KWAN WONG, a/k/a SHIU KWAN WONG,

                    Defendants.
-------------------------------------------------------------X

REPORT AND
RECOMMENDATION
16 CV 2694 (RRM)(RML)

LEVY, United States Magistrate Judge:

         By order dated August 28, 2019, the Honorable Roslynn R. Mauskopf, Chief

United States District Judge, referred plaintiffs' motion for a default judgment to me for report

and recommendation.  After granting a number of extension requests, I conducted an inquest

hearing on February 20, 2020.  (See Transcript of Hearing, dated Feb. 20, 2020 ("Tr."), Dkt. No.

96.)  For the reasons explained below, I respectfully recommend that named plaintiff Wuzi Jiao's

motion for default judgment be granted as to defendants Kitaku Japanese Restaurant, Inc., Gin

Kitaku, Inc., Yuki Kitaku, Inc., Spring Kitaku, Inc., Luna Cuisine, Inc., Rice, K. Inc., and Xiu

Chen, but denied as to defendants Yi Gin Chin and Siu Kwan Wong, and that he be awarded

$133,874.82 in damages, plus pre- and post-judgment interest.  I additionally recommend that

the claims of putative opt-in plaintiffs Guanzhuo Chen and Yong Zhan Huang be dismissed

without prejudice.

## BACKGROUND AND FACTS

Named plaintiff Wuzi Jiao ("Jiao"), on his own behalf and on behalf of others similarly situated, commenced this wage and hour action on May 27, 2016, asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq. and the New York Labor Law ("NYLL").  (See Complaint, dated May 27, 2016 ("Compl."), Dkt. No. 1.)  Shortly thereafter, putative opt-in plaintiffs Guanzhuo Chen and Yong Zhan Huang ("Huang") (collectively with Jiao, "plaintiffs") filed forms indicating their consent to join.  (See Consent Forms, filed June 29, 2016 and July 5, 2016, respectively, Dkt. Nos. 7-8.)

Defendants in this case include a collection of corporate entities, each alleged to have done business at various points in time as a single, continuously running Asian fusion restaurant, located at 29-21 23rd Avenue in Queens, New York (the "Restaurant").  (See Second Amended Complaint, dated July 10, 2018 ("Second Am. Compl."), Dkt. No. 57, ¶¶ 10-28, 40-48.)  Jiao worked at the Restaurant as a delivery person from October 1, 2014 to May 6, 2016, whereas Guanzhuo Chen and Huang each worked as sushi chefs from May 15, 2015 to January 15, 2016 and from June 1, 2015 to July 5, 2015, respectively.  (Affidavit of Wuzi Jiao, sworn to Aug. 13, 2019 ("Jiao Aff."), Dkt. No. 86-7, ¶ 3; Affidavit of Guanzhuo Chen, sworn to Aug. 21, 2019, Dkt. No. 86-9, ¶¶ 3-4; Affidavit of Yong Zhan Huang, sworn to Aug. 20, 2019 ("Huang Aff."), Dkt. No. 86-8, ¶¶ 3-4.)  The Restaurant was originally called "Kitaku," but has operated as "Rice K" since November 18, 2016.  (Second Am. Compl. ¶ 43.)  A number of individuals alleged to own and operate the Restaurant are also named as defendants.  (See id. ¶¶ 29-39.)

The complaint has been amended several times and the composition of the group of defendants has changed with each amendment.  The original complaint named as defendants Kitaku Japanese Restaurant, Inc., d/b/a Kitaku ("Kitaku"); Luna Cuisine, Inc., d/b/a Kitaku;

("Luna"); one "John Doe" corporation; Xiu Chen; and "John" Chen.  (See Compl.)  On

December 1, 2016, the complaint was amended to add corporate defendants Gin Kitaku, Inc.,

d/b/a Kitaku ("Gin"); Yuki Kitaku, Inc., d/b/a Kitaku ("Yuki"); and Spring Kitaku, Inc., d/b/a

Kitaku ("Spring").  (See First Amended Complaint, dated Dec. 1, 2016 ("First Am. Compl."),

Dkt. No. 19.)  The first amended complaint also replaced "John" Chen with Yi Gin Chin, and

added defendants Shiugeen Chin, Rosanna Chin, and Siu Kwan Wong, a/k/a Shiu Kwan Wong

("Wong").  (See id.)  The complaint was amended a second and final time on July 10, 2018, to

add corporate defendant Rice K, Inc., d/b/a Rice K ("Rice K"), and to remove Shiugeen Chin and

Rosanna Chin, who by that point had been dismissed from the case.[1]  (See Second Am. Compl.)

For clarity, the operative complaint names six corporate defendants—Kitaku, Gin, Yuki, Spring,

Luna, and Rice K (the "corporate defendants")—as well as three individual defendants—Yi Gin

Chin, Xiu Chen, and Wong (the "individual defendants") (collectively, "defendants").  (See id.)

No defendant has answered or otherwise moved with respect to the second

amended complaint, despite each defendant having been properly served with process.[2]  (See

---

[1] After being served with the first amended complaint, Shiugeen Chin and Rosanna Chin
appeared through their attorney, Joseph Yau, claiming that they had been improperly named and
had no connection with the Restaurant or any of the events giving rise to this action.  (See
Answer to Amended Complaint, dated Sept. 25, 2017, Dkt. No. 37; Letter of Joseph Yau, Esq.,
dated Aug. 24, 2017, Dkt. No. 35.)  At an initial conference held on November 29, 2017, Mr.
Yau agreed to email photographs of his clients to plaintiffs' counsel, John Troy, in order to
confirm whether they were the individuals named.  (See Minute Entry, dated Nov. 29, 2017.)
After receiving the photographs and showing them to his clients, Mr. Troy confirmed that neither
Shiugeen Chin nor Rosanna Chin was involved in the operation of the Restaurant, and plaintiffs
stipulated to their dismissal from this case with prejudice.  (See Letter of John Troy, Esq., dated
Dec. 14, 2017, Dkt. No. 43; Stipulation of Dismissal with Prejudice as to Shiugeen Chin and
Rosanna Chin, dated Nov. 25, 2017, Dkt. No. 43-1.)

[2] An individual named Xiu Chen at one point appeared in this action pro se, claiming that she
had been improperly named and requesting to vacate the Clerk's Entry of Default which she
believed had been entered against her.  (See Letter Motion to Vacate Clerk's Entry of Default,

(Continued . . . )

Affidavits of Service of Denise Lewis, sworn to Aug. 23, 2018, Dkt. Nos. 68-70; Affidavits of

Service of Robert Goyette, sworn to Dec. 31, 2018, Dkt. Nos. 74-79.)  The Clerk of the Court

noted the individual defendants' defaults on December 10, 2018 and the corporate defendants'

defaults on April 22, 2019.[3]  (See Clerk's Entries of Default, dated Dec. 10, 2018 and Apr. 22,

2019, Dkt. Nos. 73 and 82, respectively.)  On August 23, 2019, after receiving several extensions

of time, plaintiffs moved for default judgment.  (See Notice of Motion for Default Judgment,

dated, Aug. 23, 2019, Dkt. No. 85.)  Chief Judge Mauskopf referred plaintiffs' motion to me.

(See Order Referring Motion, dated Aug. 28, 2019.)  On February 2020, I held an inquest

hearing and heard testimony from Jiao and Huang, through a Mandarin Chinese interpreter.  (See

Tr.)  Guanzhuo Chen did not appear at the inquest hearing.  (See id.)

---

dated Nov. 1, 2017, Dkt. No. 38.)  It was later determined that this individual was not the same
Xiu Chen as the one named in the complaint.  (See Letter of John Troy, Esq., dated June 8, 2018,
Dkt. No. 52.)  Plaintiffs' counsel explained that, after default had been entered against Xiu Chen
with respect to the original complaint, his law firm had mailed letters to multiple addresses
connected with that name, including the address of the individual who ultimately appeared.  (See
id.)  After conferring with his clients, Mr. Troy confirmed that this individual was not the same
Xiu Chen as the one alleged to have owned and operated the Restaurant.  (See id.)  The latter
individual has never appeared in this action, despite being properly served with the original and
second amended complaint.  (See Affidavit of Service of Samantha Stanfield, sworn to Aug. 4,
2016, Dkt. No. 12; Affidavit of Service of Denise Lewis, sworn to Aug. 23, 2018, Dkt. No. 69.)

[3] Service of the second amended summons and complaint was effected on all defendants for the
first time on August 23, 2018.  (See Affidavits of Service of Denise Lewis, sworn to Aug. 23,
2018, Dkt. Nos. 62-70.)  Service was proper upon the individual defendants because the
documents were served upon a person of suitable age and discretion at the individual defendants'
actual place of business, the Restaurant, and perfected by mail pursuant to N.Y. C.P.L.R. §
308(2).  However, service was not proper upon the corporate defendants because the affidavits of
service contained insufficient information as to whether the "Jane Doe" who accepted service
was authorized to do so.  See FED. R. CIV. P. 4(h); N.Y. C.P.L.R. § 311.  Accordingly, on
December 10, 2018, the Clerk of the Court issued a certificate of default only as to the individual
defendants and directed counsel to re-serve the corporate defendants.  (See Clerk's Entry of
Default, dated Dec. 10, 2018, Dkt. No. 73; Denial of Request for Certificate of Default, dated
Dec. 10, 2018.)  On December 31, 2018, counsel re-served the corporate defendants pursuant to
New York Business Corporation Law § 306(b)(1).  (See Affidavits of Service of Robert Goyette,
sworn to Dec. 31, 2018, Dkt. Nos. 74-79.)

Plaintiffs assert claims under the FLSA and NYLL for unpaid minimum wages and overtime.  (See Second Am. Compl. ¶¶ 86-107.)  They additionally assert claims under the NYLL for failure to pay spread of hours wages, provide meal periods, maintain adequate records, and provide proper wage notices and wage statements.[4]  (See id. ¶¶ 108-110; 123-141.)  They seek back pay, liquidated damages, prejudgment interest, attorney's fees, and costs.  (See Memorandum of Law in Support of Motion for Default Judgment, dated Aug. 23, 2019 ("Pls.' Mem."), Dkt. No. 87; Damages Calculations, Dkt. No. 86.)  Jiao also seeks out-of-pocket expenses related to the maintenance of a motorcycle, which he used as a delivery vehicle.  (See Second Am. Compl. ¶¶ 111-122; Pl.'s Mem. at 2-3; Damages Calculations.)

## DISCUSSION

### A.  Motion for Default Judgment as to Guanzhuo Chen

On November 11, 2019, plaintiffs' counsel, John Troy, moved for an adjournment of the inquest hearing for several reasons, one of them being that Guanzhuo Chen, who since the commencement of this action had moved to California, was unable to take time off of work to travel to New York on the scheduled date.  (See Letter of John Troy, Esq., dated Nov. 11, 2019, Dkt. No. 92.)  I granted the motion and rescheduled the inquest from November 13, 2019 to February 20, 2020.[5]  (See Order Granting Motion to Adjourn, dated Nov. 12, 2019.)

_____

[4] The complaint additionally asserts claims for the filing of a fraudulent Internal Revenue Service return under 28 U.S.C. § 7434 and for deceptive acts and practices under New York General Business Law § 349.  (See Second Am. Compl. ¶¶ 142-148.)  Plaintiffs appear to have abandoned these claims in their default judgment motion.  (See Memorandum of Law in Support of Motion for Default Judgment, dated Aug. 23, 2019, Dkt. No. 87.)

[5] This was the second adjournment of the inquest hearing, which had originally been scheduled for October 16, 2019.  (See Order Granting Motion to Adjourn, dated Oct. 11, 2019.)

On February 3, 2020, Mr. Troy again wrote to the court, this time reporting that his law firm had lost contact with Guanzhuo Chen and stating that he could not confirm whether Guanzhuo Chen would appear at the inquest.  (See Letter of John Troy, Esq., dated Feb. 3, 2020, Dkt. No. 93.)  On the date of the inquest, Guanzhuo Chen did not appear.  (See Tr.)  Leanghour Lim, the attorney appearing for plaintiffs, confirmed that counsel had lost contact with Guanzhuo Chen and requested that the court dismiss his claims without prejudice.  (See id. at 5:5-12.)  In light of Guanzhuo Chen's failure to appear at the inquest and the reports of Mr. Troy and Ms. Lim that they have been unable to reach him, I respectfully recommend that Guanzhuo Chen's claims be dismissed without prejudice for failure to prosecute.

## B.  Motion for Default Judgment as to Huang

Huang moves for default judgment in reliance on his status as an opt-in plaintiff. (See Consent to Become a Party Plaintiff, filed July 5, 2016, Dkt. No. 8.)  While Huang has filed a form indicating his consent to join the action as a party plaintiff, he is not named in any version of the complaint and there is no evidence that his consent form was ever served on defendants. Moreover, while the complaint contains collective action allegations, plaintiffs never moved for certification of a collective action pursuant to 28 U.S.C. § 216(b).

In FLSA actions, "[c]ourts have expressed concern about whether opt-in plaintiffs are entitled to default judgment based on a complaint in which they are not named, but wherein the intent to proceed as a collective action is clear."  Charvac v. M & T Project Managers of New York, No. 12 CV 5637, 2013 WL 6711485, at *3 (E.D.N.Y. Dec. 18, 2013) (citation omitted). In cases where a collective action has not been certified, courts in this district have repeatedly held that "[w]ithout service of an amended pleading that incorporates the opt-in plaintiffs' claims, there is 'no legal basis upon which to award damages, attorney's fees, and costs to the

opt-in plaintiffs.'" Bhagwat v. Queens Carpet Mall, Inc., 14 CV 5474, 2017 WL 1365121, at *5 (E.D.N.Y. Mar. 10, 2017) (quoting Charvac, 2013 WL 6711485, at *3), report and recommendation adopted, 2017 WL 1376372 (E.D.N.Y. Apr. 11, 2017); see also Tejada v. La Selecta Bakery, Inc., No. 17 CV 5882, 2019 WL 2343909, at *2 (E.D.N.Y. May 1, 2019), report and recommendation adopted, 2019 WL 2341680 (E.D.N.Y. June 3, 2019); Ntalianas v. B & A Contracting of Landmark, Inc., No. 16 CV 5934, 2018 WL 1701960, at *4 (E.D.N.Y. Feb. 26, 2018), report and recommendation adopted, 2018 WL 1582294 (E.D.N.Y. Mar 31, 2018); Noboa v. Toron Restoration Corp., No. 14 CV 730, 2015 WL 1672815, at *4 (E.D.N.Y. Mar. 26, 2015).[6]

In circumstances such as this, the typical course of action has been to grant leave to amend the complaint, while deferring a ruling on default judgment as to any named plaintiffs until the opt-in plaintiffs are formally joined. See Tejada, 2019 WL 2343909, at *2-3; Ntalianas, 2018 WL 1701960, *5; Bhagwat, 2017 WL 1365121, at *6; Noboa, 2015 WL 1672815, at *5; Charvac, 2013 WL 6711485, at *3. Courts have noted the uncertainty as to whether they "could continue to adjudicate the FLSA collective action after granting [the named] Plaintiff default judgment" because doing so may "trigger the mootness doctrine." See Bhagwat, 2017 WL 1365121, at *6 (quoting Troncone v. Velahos, No. 10 CV 2961, 2011 WL 3236219, at *8 n.8 (D. N.J. July 28, 2011, reconsidered on other grounds, 2012 WL 3018061 (D. N.J. July 23, 2012)). Thus, courts have found that fairness considerations counseled in favor of deferring entry of default judgment. See id. (noting that an entry of default judgment in favor of the named plaintiff would "disqualify [him] from serving as the class representative, frustrate renewal of

---

[6] This analysis applies equally to Guanzhuo Chen, who similarly filed a consent form, but is not named in any version of the complaint. However, I have already recommended that Guanzhuo Chen's claims be dismissed without prejudice for failure to prosecute.

7

[the putative opt-in plaintiff's] motion for default judgment, or preclude prosecution of the claims of other individuals who may qualify as opt-in plaintiffs"); see also Tejada, 2019 WL 2343909, at *3 ("[A]n abundance of caution is warranted because there is no evidence that the Named Plaintiffs now intend the case to proceed on an individual basis; to the contrary, they seek default judgment both for themselves and the Opt-in Plaintiffs.").

In this case, however, fairness considerations counsel in favor of a different course of action. With respect to prejudice to future opt-in plaintiffs, it seems exceedingly unlikely at this juncture that additional opt-in plaintiffs will seek to join. This case was filed, and the current opt-ins filed their consents, nearly four years ago. Moreover, while entry of default in favor of Jiao could prevent Huang from formally joining as a plaintiff in this case and separately moving for default judgment at a later time, it would not preclude him from filing a separate action against defendants in state court.[7] On the other hand, it would be unjust to further delay relief to Jiao, who has a significantly larger claim against defendants than does Huang, given that Huang is only alleged to have worked at the Restaurant for approximately one month. (See Huang Aff. ¶ 4; Damages Calculations.) For these reasons, I respectfully recommend that Huang's motion for default judgment be denied, that his claims be dismissed without prejudice, and that the court proceed with entry of default judgment in favor of Jiao.

---

[7] Huang's FLSA claims accrued in 2015 (see Huang Aff. ¶ 4); therefore, the statute of limitations on those claims has run. See 29 U.S.C. § 255(a) (establishing a two- or three-year statute of limitations, depending on whether a violation was willful). His NYLL claims, however, will remain timely until 2021. See N.Y. Lab. L. §§ 198(3); 663(3) (establishing a six-year statute of limitations). Because a plaintiff may not receive "double recovery" of unpaid wages under both statutes, Hernandez v. Jrpac Inc., 14 CV 4176, 2016 WL 3248493, at *31 (S.D.N.Y. June 9, 2016), he will not be prejudiced in terms of the amount of his potential recovery.

### C. Motion for Default Judgment as to Jiao

A defendant's "default is deemed to constitute a concession of all well pleaded allegations of liability." Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Once a default judgment is entered, the court "is required to accept all of [the plaintiff's] factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)). The court must also "determine whether [the plaintiff's] allegations establish [the defendants'] liability as a matter of law." Id.

Jiao has sufficiently pleaded factual allegations that give rise to liability for unpaid minimum wages and overtime under the FLSA and the NYLL. He has also sufficiently pleaded claims under the NYLL for unpaid spread of hours wages, failure to provide wage statements and wage notices, as well as for reimbursement of costs related to his motorcycle.[8] The extent to which he can recover damages from the defaulting defendants based upon these violations depends on whether: (1) his claims were timely; (2) he is a covered employee under the FLSA and the NYLL; and (3) defendants were his employers under the FLSA and NYLL.

### 1. Timeliness

For a plaintiff's claims to be timely under the FLSA, they must have arisen within the two years prior to the filing of the complaint, or—for willful violations—within the three years prior. 29 U.S.C. § 255(a). Here, the complaint alleges willful violations of the Act. (See Second Am. Compl. ¶¶ 89, 102) and defendants have, by virtue of their default, waived the affirmative defense of statute of limitations. See Gunawan v. Sake Sushi Rest., 897 F. Supp. 2d

---

[8] As described *infra*, Jiao does not have viable claims for failure to provide meal periods or record-keeping violations.

76, 87 (E.D.N.Y. 2012) (citing Day v. McDonough, 547 U.S. 198, 202 (2006); Davis v. Bryan, 810 F.2d 42, 44 (2d Cir. 1987); Archie v. Grand Cent. P'ship, 997 F. Supp. 504, 536 (S.D.N.Y. 1998)).  Because Jiao alleges that he was employed by defendants and that underpayment of wages occurred between October 1, 2014 and May 6, 2016, his claims as to the defendants named in the original and first amended complaints, which were filed on May 27, 2016 and December 1, 2016, respectively, are timely.  Those portions of his claims against Rice K occurring before July 10, 2015 are not timely, as Rice K was not added as a defendant until the second amended complaint was filed on July 10, 2018.  Nor do they relate back to the earlier versions of the complaint.  See Atakhanova v. Home Family Care Inc., No. 16 CV 6707, 2019 WL 2435856, at *6 (E.D.N.Y. Feb. 19, 2019) (noting that the relation back doctrine does not apply in situations where a plaintiff seeks to add an additional defendant (citing In re Vitamin C Antitrust Litig., 995 F. Supp. 2d 125, 129 (E.D.N.Y. 2014)).  Nonetheless, he may recover damages from Rice K if these claims are timely under the NYLL.

   For Jiao's claims to be timely under the NYLL, his claims must have arisen within the six years prior to the filing of the complaint.  See N.Y. LAB. L. §§ 198(3); 663(3). Because Jiao alleges that he was employed by defendants and that underpayment of wages, wage notice violations, and wage statement violations occurred after July 10, 2012, his claims under the NYLL are timely.

   2. Employee Coverage Under the FLSA

   Because the minimum wage and overtime provisions of the FLSA and the NYLL apply only to employees of covered employers, a plaintiff in a wage and hour action must show that he or she was defendants' employee, and that defendants were employers subject to the coverage of each statute.  For purposes of the FLSA, an employee is "any individual employed

by an employer," meaning any individual whom an employer "suffer[s] or permit[s] to work." 29 U.S.C. §§ 203(e)(1), (g).  Absent a statutory exemption, such individuals are protected by the FLSA, so long as they work for a covered employer.  An employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Person is defined as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  29 U.S.C. § 203(a).  In addition, for employees to be covered by the FLSA, they must show either that their employer was an enterprise engaged in interstate commerce *or* that their work as employees regularly involved them in interstate commerce.  See 29 U.S.C. § 207(a).

Here, Jiao has adequately pleaded that he was an employee to whom no statutory exemption applies, insofar as he alleges that he was hired to work as a delivery person at the Restaurant and that he worked there for approximately a year and a half before Xiu Chen terminated his employment.  (See Second Am. Compl. ¶¶ 62-65; see also Tr. at 8:23-9:1.)  In addition, Jiao alleges that the corporate defendants, individually and collectively, had gross receipts of greater than $500,000 per year during the relevant period, and that they were engaged in interstate commerce.  (See Second Am. Compl. ¶¶ 11, 14, 20, 19, 23, 26.)  Thus, he alleges that he is a covered employee under the FLSA.  This allegation is, on its face, conclusory, insofar as it restates the statutory definition of enterprise coverage without providing additional facts.  The only supporting factual allegation is that the corporate defendants each "purchased and handled goods moved in interstate commerce."  (See id. ¶¶  12, 15, 18, 21, 24, 27.)

Multiple courts in this district have held that similarly conclusory allegations of enterprise coverage may be accepted on a motion for default judgment where it may be inferred from the type of business enterprise that it was engaged in interstate commerce.  See, e.g.,

Remache v. Mac Hudson Grp., No. 14 CV 3118, 2018 WL 4573072, at *4 (E.D.N.Y. Sept. 7, 2018), report and recommendation adopted, 2018 WL 4568860 (E.D.N.Y. Sept. 24, 2018) (holding that "the enterprise that employed plaintiffs—i.e. a construction business—is a type that is typically involved in interstate commerce" and that plaintiffs had therefore sufficiently established that they were covered employees under the FLSA); Huerta v. Victoria Bakery, No. 10 CV 4754, 2012 WL 1107655, at *2 (E.D.N.Y. Mar. 30, 2012) ("[T]he original complaint . . . provides a sufficient basis . . . for inferring the requisite interstate commerce connection under the sensible approach adopted by other judges in this district. The complaint alleges that plaintiffs . . . were employed as bread makers in a Brooklyn-based bakery with over half a million dollars in annual sales. It is inconceivable that some of the bread-making materials used by plaintiffs did not originate out of state or that the bakery did not sell its products outside the State of New York."); Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011) ("Because even local business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce, the test is met if Plaintiffs merely handled supplies or equipment that originated out-of-state . . . . The Court finds it logical to infer here that the cleaning supplies utilized by the Plaintiffs originated outside of New York. Plaintiffs' Complaint, therefore, fairly alleges that the Defendants are an 'enterprise engaged in commerce.' Consequently, the Court finds that Plaintiffs are covered by the FLSA." (internal citations and quotation marks omitted)).[9]

---

[9] But see Perez v. Queens Boro Yang Cleaner, Inc., No. 14 CV 7310, 2016 WL 1359218, at *4 (E.D.N.Y. Mar. 17, 2016) ("While some judges in this district disagree, and have granted default judgments notwithstanding a similar lack of specificity in other cases, I conclude that requiring non-conclusory allegations is more consonant with applicable case law concerning pleading requirements, and that it does not frustrate the FLSA's remedial purpose to require a plaintiff seeking the statute's protection to explain in her pleading just what it is about her employer's

(Continued . . . )

I agree with those courts that have adopted this approach, and therefore find that the enterprise that employed Jiao was involved in interstate commerce.  Jiao has therefore sufficiently established that he is a covered employee under the FLSA.

3.  Employer Status of Individual and Corporate Defendants

Jiao seeks to hold nine defendants—six corporations and three individuals—jointly and severally liable for his unpaid wages.  (See Second Am. Compl. ¶¶ 10-39.)  He alleges that all of the individual defendants were "officers, directors, managers, and/or majority shareholders or owners" of each of the corporate defendants (id. ¶ 29), and that the corporate defendants may be considered  "the same employer" for the purposes of liability because they are "virtually indistinguishable from each other" and because they existed with substantial temporal overlap.  (Id. ¶¶ 40-41).

"The FLSA contemplates that more than one employer may be responsible for violations of the statute."  Remache, 2018 WL 4573072, at *5 (quoting Dixon v. Zabka, No. 11 CV 982, 2014 WL 6084351, at *3 (D. Conn. Nov. 13, 2014)).  There are two principal theories under which multiple entities may be held jointly and severally liable for unpaid wages: "single integrated enterprise" and "joint employer."  Grant v. HER Imports NY, LLC, No. 15 CV 5100, 2018 WL 3133454, at *10 (E.D.N.Y. Feb. 16, 2018), report and recommendation adopted, 2018 WL 1686103 (E.D.N.Y. Mar. 31, 2018).  These theories are mutually exclusive.  Id. (citing Arcuelo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005)).

Joint employers are "separate legal entities" which "handle certain aspects of their employer-employee relationship jointly."  Arcuelo, 425 F.3d at 198 (citation omitted).  To

---

business that brings it within the law's ambit." (footnote omitted)), report and recommendation adopted, 2016 WL 1337310 (E.D.N.Y. Apr. 5, 2016).

determine whether putative joint employers should be deemed to have been plaintiffs' joint employer, courts in the Second Circuit must evaluate "'the circumstances of the whole activity,' viewed in light of 'economic reality.'" Zheng v. Liberty Apparel Co., 355 F.3d 61, 71 (2d Cir. 2003) (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) and Goldberg v. Whitaker House Coop., 366 U.S. 28, 33 (1961), respectively).

A joint employment relationship may be found where a putative joint employer exercised either formal control or functional control over the plaintiff.  See Barfield v. N.Y.C. Health and Hosps. Corp., 537 F.3d 132, 142–43 (2d Cir. 2008).  To determine formal control, courts in the Second Circuit consider whether an entity: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 13 (2d Cir. 1984) (quoting Bonnette v. Cal. Health and Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)).  "[W]hen an entity exercises those four prerogatives, that entity, in addition to any primary employer, must be considered a joint employer." Zheng, 355 F.3d at 67.  To determine functional control, courts consider a broader set of six factors:

> (1) whether the [putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to the [putative joint employer]'s process of production; (4) whether responsibility under the contracts could pass from one [direct employer] to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

Dixon, 2014 WL 6084351, at *3 (quoting Zheng, 355 F.3d at 72).  The court is also free to consider "any other factors it deems relevant to its assessment of the economic realities."  Zheng, 355 F.3d at 72.

In contrast, the single integrated enterprise theory is a mechanism by which "courts may treat a group of distinct but closely affiliated entities as a single employer for FLSA purposes."  Hernandez v. Delta Deli Mkt., No. 18 CV 375, 2019 WL 643735, at *3 (E.D.N.Y. Feb. 12, 2019).  "[S]eparate corporations under common ownership and management are a common example of such a single integrated enterprise."  Id.  (internal quotation marks omitted) (quoting Perez v. Westchester Foreign Autos, Inc., No. 11 CV 6091, 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013)).

Courts determine whether multiple entities may be considered a single employer under this theory by considering four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  Juarez v. 449 Rest., Inc., 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014); see also Manzanares v. Your Favorite Auto Repair & Diagnostic Ctr., 17 CV 5001, 2018 WL 6718766, at *4 (E.D.N.Y. Nov. 7, 2018), report and recommendation adopted, 2018 WL 6517111 (E.D.N.Y. Dec. 11, 2018).  With respect to restaurants, courts have found that facts supporting the existence of a single integrated enterprise include "common décor, name, menu and marketing; the use of the same employees at multiple locations; the transfer of items between restaurants; use of the same central payroll office, common storage space and leases; and the distribution of common employee guidelines and procedures across different businesses."  Yu Wei Cao v. Miyama, Inc., No. 15 CV 266, 2019 WL 4279407, at *7 (E.D.N.Y. Sept. 10, 2019) (quoting Marin v. APU

Foods Corp., No. 17 CV 3224, 2018 WL 1462236, at *2 (E.D.N.Y. Feb. 26, 2018), report and
recommendation adopted, 2018 WL 1459488 (E.D.N.Y. Mar. 23, 2018)).

### a. *Individual Defendants*

According to the complaint, Yi Gin Chin and Xiu Chen are a father and daughter
who jointly own and operate the Restaurant, and are referred to by employees as "Boss" and
"Lady Boss," respectively.  (Second Am. Compl. ¶¶ 30, 33, 46.)  Each is alleged to have the
authority to hire and fire workers, set work schedules, determine rates of pay, and assign workers
to perform various tasks, such as chopping vegetables and mopping the floor.  (Id. ¶¶ 31, 34.)

When asked at the inquest hearing who had hired him, Jiao answered "the boss."
(Tr. at 7:20-21.)  When asked who had fired him, he answered "[t]he daughter of the boss."  (Id.
at 8:2-3.)  The court then asked Jiao the names of the "boss and the boss's daughter."  (Id. at 8:6-
7.)  With respect to "the boss," he answered "[l]ast name Chen, the first name Yi Ming" and
spelled "first name Y-I, M-I-N-G.  Last name C-H-E-N."  (Id. at 8:8-9.)  He identified the
"boss's daughter" as Xiu Chen.  (Id. at 8:9-11.)  The court then asked him to clarify the identity
of the other individual he had mentioned, besides Xiu Chen.  (Id. at 8:12.)  His interpreter
answered "the other one is Chen Yi Ming.  Maybe a different pronunciation because this is
Chinese Mandarin this pronunciation, and this [referring to the complaint] probably is Cantonese
spelling."  (Id. at 8:14-17.)  When the court asked Jiao to spell the name of "the boss" once more
for the record, he spelled "Y-I, G-I-N, C-H-I-N."  (Id. at 8:20-22.)  However, when the court
followed up by asking who had hired and fired him, he again referenced "Yi Ming Chen," stating
"Yi Ming hired me, I was fired by his daughter Xiu."  (Id. 8:23-9:1.)

While I find Jiao's allegations and testimony sufficient to establish an
employment relationship with Xiu Chen, his repeated references to "Yi Ming Chen," an

individual not named in any version of the complaint, raise significant questions as to whether the complaint properly identifies Yi Gin Chin as "the boss" who had hired him.  While Jiao's interpreter attempted to clarify the confusion with her allusion to different spellings and pronunciations in Mandarin and Cantonese, the court ultimately does not have sufficient information to determine whether this explanation is credible; nor does his interpreter have any personal knowledge as to whether Yi Ming Chen and Yi Gin Chin may be the same person. Therefore, I recommend that plaintiff's motion be denied as to Yi Gin Chin.

I also recommend that plaintiff's motion be denied as to Wong.  While Wong is alleged to have had the same authority as Yi Gin Chin and Xiu Chen (see Second Am. Compl. ¶ 38), the complaint ultimately does not paint a clear picture as to Wong's role in the Restaurant. Moreover, Wong is not mentioned in Jiao's sworn affidavit; nor was Wong mentioned in his testimony at the inquest hearing.  (See Jiao Aff.; Tr.)

### b.  *Corporate Defendants*

The six corporate defendants were active during different periods of time from early 2008 to the present.  While some overlapped for only a short time, or not at all, others operated concurrently for years.  (See Second Am. Compl. ¶ 42; Declaration of John Troy, Esq., dated Feb. 21, 2020 ("Troy Decl."), Dkt. No. 95-1.)  Only Luna remains an active corporation; the other corporate defendants have been dissolved.[10]  Gin, Yuki, and Spring were each active for the entirety of Jiao's employment, whereas Luna was active for approximately the last two

---

[10] While Mr. Troy, in his February 21, 2020 declaration, states that Rice K is also an active corporation (see Troy Decl.), a search of the New York Department of State's Corporation and Business Entity Database reveals that Rice K dissolved on November 6, 2019.  See New York Department of State, Division of Corporations, Corporation and Business Entity Database (search for "Rice K, Inc."), https://www.dos.ny.gov/corps/bus_entity_search.html.

months of his employment.  (See Second Am. Compl. ¶ 42, 62.)  I have summarized each

corporate defendant's incorporation and dissolution dates, as well as the name under which each

corporate defendant is alleged to have done business, in the chart below:

| Name | D/b/a | Incorporation Date | Dissolution Date |
|------|-------|--------------------|------------------|
| Kitaku | Kitaku | January 29, 2008 | July 27, 2011 |
| Gin | Kitaku | November 20, 2009 | June 29, 2016 |
| Yuki | Kitaku | September 4, 2009 | June 29, 2016 |
| Spring | Kitaku | January 25, 2012 | August 31, 2016 |
| Luna | Kitaku and Rice K | February 24, 2016 | N/A |
| Rice K | Rice K | June 20, 2018 | November 6, 2019 |

While plaintiff has adduced only minimal evidence as to his employment

relationship with the corporate defendants, he testified that he was hired to work at "Kitaku

Restaurant."  (See Tr. at 5:22-6:2.)  The complaint alleges that each of the corporate defendants

shared a principal place of business—29-21 23rd Avenue in Queens, New York—where they

each did business as the same restaurant.  (See Second Am. Compl. ¶¶ 10-28, 45.)  It further

alleges that they shared common ownership and management in Xiu Chen who, in her capacity

as owner and manager, directed Jiao's work.  (See id. ¶¶ 29-31; Jiao Aff. ¶ 17; Tr. at 9:1.)  While

the name of the Restaurant changed from "Kitaku" to "Rice K" on November 18, 2016 (Second

Am. Compl. ¶ 43), this appears to have been a mere re-branding.  The complaint alleges that Xiu

Chen "continues to claim that she is the Owner of Rice K on outlets like Yelp" and that Rice K

claims that it is "[c]elebrating 20 years in the neighborhood."  (Id. ¶¶ 47-48; see also Screenshots

of Rice K's Yelp and Facebook Pages, Dkt. Nos. 55-3 and 55-4, respectively.)  Based on these

facts, I find that the corporate defendants were a single integrated enterprise and that this enterprise was Jiao's joint employer, along with Xiu Chen.[11]

**D.  Damages**

Once the court has determined that the defaulting defendants are liable, "the court must conduct an inquiry to establish damages to a 'reasonable certainty.'"  Gunawan, 897 F. Supp. 2d at 83 (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)).  "[T]he quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."  Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974).  "The burden is on the plaintiff to establish [his] entitlement to recovery."  Bravado Int'l Grp. Merch. Servs. v. Ninna, Inc., 655 F. Supp. 2d 177, 189 (E.D.N.Y. 2009).

1.  Hours Worked

"As a preliminary matter, when an employer fails to maintain accurate records or where, as here, no records have been produced as a consequence of a defendant's default, courts have held that the 'plaintiff['s] recollection and estimates of hours worked are presumed to be correct.'"  Gunawan, 897 F. Supp. 2d at 88 (quoting Zeng Liu v. Jen Chu Fashion Corp., No. 00 CV 4221, 2004 WL 33412, at *3 (S.D.N.Y. Jan. 7, 2004)); see also Kim v. Kum Gang, Inc., No. 12 CV 6344, 2015 WL 2222438, at *25 (S.D.N.Y. Mar. 19, 2015) (where an employer fails to

---

[11] While the single employer doctrine is most commonly applied where two or more entities operate concurrently, it has been applied in situations where one entity was not incorporated until just before the plaintiff's employment terminated, see Grant, 2018 WL 3133454, at *11, and where two entities overlapped in existence for only two months, yet shared the same employees, used the same office space, performed the same trade, and were under common ownership, see Bricklayers and Allied Craftworkers v. Local 2 v. C.G. Yantch, Inc., 316 F. Supp. 2d 130, 143 (N.D.N.Y. 2003).  In this case, while not all of the corporate defendants overlapped with one another, or operated during Jiao's period of employment, the record indicates that, as a group, they continuously operated the same restaurant, at the same location, under the same ownership for upwards of a decade.  On these facts, I find it appropriate to consider them a single employer.

maintain records of wages and hours, plaintiffs "need only prove that they performed work for which they were not properly compensated and produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference") (internal quotation marks and citations omitted); Hart v. Rick's Cabaret Int'l, Inc., 60 F. Supp. 3d 447, 466 (S.D.N.Y. 2014) ("It would be manifestly unfair to allow employers to avoid, or reduce, their liability simply because they kept shoddy records."). Here, because defendants have defaulted and no employment records have been produced, the court will presume the accuracy of Jiao's recollection and estimates of hours worked, as stated in his testimony at the inquest.

Jiao testified that he worked seven days per week as follows: Monday through Thursday from 11:00 a.m. to 11:00 p.m.; Friday and Saturday from 11:00 a.m. to 12:00 a.m.; and Sunday from 12:00 p.m. to 11:00 p.m. (Tr. at 6:18-7:3; 9:19-10:12.) Therefore, he worked eighty-five hours per week. He testified that he did not receive any breaks during his working hours. (Id. at 9:5-8.) While he did not take any vacations during his employment, he testified that he would take a half day off for "personal work" once or twice a month on average. (Id. at 9:9-14.) Over the course of his employment, this would have amounted to approximately two weeks.[12] Therefore, while his employment spanned eighty-three weeks, he is entitled to compensation for eighty-one weeks.

   2.   Minimum Wage Compensation

Under both the FLSA and the NYLL, employees must be paid at least a minimum hourly wage for each hour that they work. See 29 U.S.C. § 206(a); N.Y. LAB. LAW § 652. The federal minimum wage does not preempt the state minimum wage, see 29 U.S.C. § 218(a), and a

---

[12] This figure was calculated as follows: 19 months employment x 1.5 half days off per month = 28.5 half days off throughout employment; 28.5/2 = 14.25 full days off throughout employment.

plaintiff may recover under whichever statute provides the highest measure of damages.

Wicaksono v. XYZ 48 Corp., No. 10 CV 3635, 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), report and recommendation adopted, 2011 WL 2038973 (S.D.N.Y. May 24, 2011). Throughout Jiao's employment, the federal minimum wage was $7.25. (See United States Department of Labor, Wage and Hour Division, *History of Federal Minimum Wage Rates Under the Fair Labor Standards Act, 1938 – 2009*, https://www.dol.gov/agencies/whd/minimum-wage/history/chart). From Jiao's date of hire on October 1, 2014 through December 30, 2014, the New York state minimum wage was $8.00. (See New York Department of Labor, *History of the General Hourly Minimum Wage in New York State*, https://labor.ny.gov/stats/minimum_wage.shtm). From December 31, 2014 through December 30, 2015, it was $8.75. (See id.) Finally, from December 31, 2015 through his date of termination on May 6, 2016, it was $9.00. (See id.) Since, at all relevant times, the New York State minimum wage was higher than the federal minimum wage, I will use that rate to calculate damages.

Jiao testified that he was paid a flat rate of $1,500 per month, or $375 per week, for the duration of his employment, and that he worked eighty-five hours per week. (See Tr. at 6:18-7:6, 9:19-10:12.) This amounts to an hourly rate of $4.41, which is below the statutory minimum.

Both the FLSA and the NYLL contain "tip credit" provisions, which "permit an employer to pay a tipped worker a cash wage that is lower than the statutory minimum wage, provided that the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage." Inclan v. N.Y. Hosp. Grp., 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015). To be eligible for a tip credit under the FLSA, an employer must "satisfy two conditions: (1) inform the employee of the 'tip credit' provision . . . and (2) permit the employee to retain all of the tips the

employee receives." Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011) (quoting Jin v. Pacific Buffet House, No. 06 CV 579, 2009 WL 2601995, at *4 (E.D.N.Y. 2009)).  Where an employer does not strictly comply with these two requirements, it may not avail itself of the tip credit to offset its minimum wage damages.  Cabrera v. Canela, 412 F. Supp. 3d 167, 182 (E.D.N.Y. 2019); see also Chung v. New Silver Palace Rest., 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) ("The two prerequisites . . . are strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage.").

In this case, while the complaint implies that Jiao earned tips, it also alleges that defendants did not inform him of their use of the tip credit.  (See Second Am. Compl. ¶¶ 50-53, 58, 69.)  Therefore, defendants are not entitled to credit any tips he may have earned towards their minimum wage obligation and I will assume that he earned $375 per week for the purpose of calculating minimum wage damages.

From Jiao's date of hire on October 1, 2014 through December 30, 2014, the New York State minimum wage was $8.00.  If Jiao had been paid the minimum wage during this period, he would have earned $680 per week ($8.00 x 85).  Therefore, I find that he was underpaid by $305 per week, or $3,965 for this thirteen week period.

From December 31, 2014 through December 30, 2015, the New York State minimum wage was $8.75.  If Jiao had been paid the minimum wage during this period, he would have earned $743.75 per week ($8.75 x 85).  Therefore, he was underpaid by $368.75 per week.  As discussed above, Jiao testified that he took a half day off once or a twice a month on average, which amounts to two weeks over the course of his employment.  Since the court has no means of determining when these half days off were taken, I find it fairest to subtract the two weeks from this period, since it is the longest and thus the most likely to have contained those

days.[13]  Therefore, compensating for fifty weeks rather than fifty two weeks, I find that Jiao was underpaid by $18,437.50 for this period.

Finally, from December 31, 2015 through Jiao's date of termination on May 6, 2016, the New York State minimum wage was $9.00.  If Jiao had been paid the minimum wage during this period, he would have earned $765 per week ($9.00 x 85).  Therefore, I find that he was underpaid by $390 per week, or $7,020 for this eighteen week period.

In sum, I find that Jiao is owed $29,422.50 in unpaid minimum wage compensation.

3.  <u>Overtime Compensation</u>

Jiao is entitled to overtime compensation under both the FLSA and NYLL at the rate of one and one-half times his regular rate of pay for the hours he worked in excess of forty during a workweek.  <u>See</u> 29 U.S.C. § 207(a)(1); N.Y. COMP. CODES T. & RECS. tit. 12, § 142-2.2. Jiao asserts that he never received overtime compensation during his employment.  (<u>See</u> Second Am. Compl. ¶ 68; Tr. at 9:2-4.)  He is therefore entitled to recover fifty percent of the applicable minimum wage for overtime hours worked during his employment.  <u>See</u> <u>Jaramillo v. Banana King Rest. Corp.</u>, 12 CV 5649, 2014 WL 2993450, at *4 (E.D.N.Y. June 30, 2014).  Based on Jiao's testimony, he worked an average of forty-five overtime hours per week.  (<u>See</u> Tr. at 6:18-7:3; 9:19-10:12.)  He is therefore entitled to $2,340 in unpaid overtime compensation for the period from October 1, 2014 through December 30, 2014 (($4.00 x 45) x 13); $9,855.00 in unpaid overtime compensation for period from December 31, 2014 through December 30, 2015 (($4.38 x 45) x 50); and $3,645 in unpaid overtime compensation for period from December 31,

---

[13] In my subsequent calculations, I will continue to compensate for fifty weeks in calendar year 2015 rather than fifty-two.

2015 through May 6, 2016 (($4.50 x 45) x 18), for a total of $15,840 in unpaid overtime compensation.

    4.  <u>Spread of Hours</u>

       Jiao further claims that he is entitled to unpaid spread of hours wages under N.Y. COMP. CODES R. & REGS. tit. 12, § 146-1.6.  (<u>See</u> Second Am. Compl. ¶¶ 108-110.)  That provision provides that "[o]n each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate."  N.Y. COMP. CODES R. & REGS. tit. 12, § 146-1.6(a).  "[T]he weight of authority in this Circuit holds that '[a] limitation upon a plaintiff's eligibility to recover for spread-of-hours pay is that the plaintiff not earn more than the [state] minimum wage.'"  <u>Tan v. Voyage Express Inc.</u>, No. 15 CV 6202, 2017 WL 2334969, at *3 (E.D.N.Y. May 25, 2017) (quoting <u>Luna v. Gon Way Constr.</u>, No. 16 CV 1411, 2017 WL 835321, at *11 (E.D.N.Y. Feb. 14, 2017), <u>report and recommendation adopted</u>, 2017 WL 835174 (E.D.N.Y. Mar. 2, 2017)).  Because Jiao worked more than ten hours per day and was paid less than the minimum wage, he is entitled to an additional hour of compensation at the applicable minimum wage rate for each shift that he worked more than ten hours.

       Jiao testified that he worked more than ten hours per day, seven days per week throughout his employment.  Therefore, he is entitled to $728 in unpaid spread of hours wages for the period from October 1, 2014 through December 30, 2014 (($8.00 x 7) x 13); $3,062.50 in unpaid spread of hours wages for the period from December 31, 2014 through December 30, 2015 (($8.75 x 7) x 50); and $1,134 in unpaid spread of hours wages for the period from December 31, 2015 through May 6, 2016 (($9.00 x 7) x 18), for a total of $4,924.50 in unpaid spread of hours wages.

5. <u>Liquidated Damages</u>

Jiao requests liquidated damages under the NYLL.  (Pl.'s Mem. at 8); <u>see also</u>

<u>Rana v. Islam</u>, 887 F.3d 118, 119 (2d Cir. 2018) (per curiam) (holding that a plaintiff may not

recover cumulative liquidated damages under both the FLSA and NYLL for the same time

period).  The NYLL provides for liquidated damages equaling one-hundred percent of wages

due.  <u>See</u> N.Y. LAB. LAW § 663(1).  Moreover, under the NYLL, "liquidated damages are

presumed unless defendants can show subjective good faith."  <u>Zubair v. EnTech Eng'g, P.C.</u>, 900

F. Supp. 2d 355, 360 n.3 (S.D.N.Y. 2012); <u>see</u> N.Y. LAB. LAW § 663(1).  As defendants have

defaulted, they have not established good faith to rebut the liquidated damages presumption.

Therefore, I respectfully recommend that Jiao be awarded $50,187 in liquidated damages.

6. <u>Wage Notices</u>

Jiao requests statutory damages for defendants' failure to provide a time-of-hire

wage notice in compliance with New York's Wage Theft Prevention Act ("WTPA"), which

requires employers to "provide [their] employees, in writing . . . a notice containing . . . the rate

or rates of pay thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or

other . . . "  N.Y. LAB. LAW § 195(1).  Beginning April 9, 2011, the WTPA required employers

to provide written wage notices "at the time of hiring, and on or before February first of each

subsequent year of the employee's employment with the employer."  N.Y. LAB. LAW § 195(1-a)

(eff. Apr. 9, 2011 to Feb. 27, 2015).  By an amendment to the WTPA, effective February 27,

2015, that provision changed to require employers to provide written wage notices only "at the

time of hiring."  2014 N.Y. LAWS ch. 537 § 1, <u>amending</u> N.Y. LAB. LAW § 195(1-a).

Between April 9, 2011 and February 26, 2015, the WTPA entitled employees who

did not receive proper wage notices to statutory damages of $50 per week to a maximum of

$2,500.  See Miguel v. Mi Bella Puebla Corp., No. 16 CV 1593, 2017 WL 4838820, at *6

(E.D.N.Y. Sept. 6, 2017), report and recommendation adopted, 2017 WL 4838761 (E.D.N.Y.

Oct. 24, 2017).  Beginning on February 27, 2015, statutory damages under the WTPA were

increased to $50 per day to a maximum of $5,000.  Id. (citing N.Y. LAB. LAW § 198(1-b)).

Jiao alleges that he did not receive a wage notice at the time of his hire.  (See

Second Am. Compl. ¶¶ 59, 133-37; Tr. at 9:15-18.)  Because Jiao was hired between April 9,

2011 and February 26, 2015, he is entitled to $2,500 in statutory damages for defendants' failure

to provide a time-of-hire wage notice.[14]

7.  Wage Statements

Jiao also requests statutory damages for defendants' failure to provide wage

statements in compliance with the NYLL.  The WTPA requires employers to furnish each

employee with a statement with every payment of wages—i.e., a paystub—that lists, inter alia,

the dates of work covered by that payment of wages, the employer's address and telephone

number, the applicable rate or rates of pay, applicable deductions, and any allowances claimed as

---

[14] While the annual wage notice requirement was still in effect during Jiao's first year of
employment, he is not entitled to damages for defendants' failure to provide an annual wage
notice that year, as the WTPA did not provide for damages for annual wage notice violations
during the time that requirement was in effect.  See Remache, 2018 WL 4573072, at *17 ("I
agree with those courts that have held that no damages are available for annual wage notice
violations, as the text of the statute is contrary to such a result. . . . Even though the Act, prior to
the 2015 amendments, required annual wage notices, it did not provide that employees could
recover civil damages for a violation of this requirement; only the New York Department of
Labor could pursue such remedies." (footnote and citations omitted)); Gamero v. Koodo Sushi
Corp., 272 F. Supp. 3d 481, 510 n.13 (S.D.N.Y. 2017) ("Although the statute extended a private
cause of action to employees whose employers failed to provide an initial wage notice at their
hire, it did not create a private cause of action for employees whose employers failed to furnish
the annual notice in following years." (italics in original) (internal quotation marks, citations, and
brackets omitted)); but see Inclan, 95 F. Supp. 3d at 502.

part of the minimum wage.  N.Y. LAB. LAW § 195(3).  Jiao alleges that he never received wage

statements with his pay.  (See Second Am. Compl. ¶¶ 59, 138-141; Tr. at 7:7-9, 9:15-18.)

Prior to February 27, 2015, "the WTPA entitled employees to recover statutory

damages for violations of the wage statement requirement of $100 per work week, not to exceed

$2,500."  Baltierra v. Advantage Pest Control Co., No. 14 CV 5917, 2015 WL 5474093, at *10

(E.D.N.Y. Sept. 18, 2015) (citation omitted); accord Inclan, 95 F. Supp. 3d at 501; see also 2010

N.Y. LAWS ch. 564 § 7, amending N.Y. LAB. LAW § 198(1-d).  By an amendment to the WTPA

effective February 27, 2015, the law changed to allow employees to recover statutory damages of

$250 dollars "for each work day that the violations occurred or continue to occur," not to exceed

$5,000.  2014 N.Y. LAWS ch. 537 § 2, amending N.Y. LAB. LAW § 198(1-d); see also Zhang v.

Red Mtn. Noodle House Inc., No. 15 CV 628, 2016 WL 4124304, at *6 n.13 (E.D.N.Y. July 5,

2016), report and recommendation adopted, 2016 WL 4099090 (E.D.N.Y. Aug. 2, 2016).

Because Jiao's employment after February 26, 2015 spans more than twenty days, he is entitled

to damages in the full statutory amount of $5,000 for defendants' failure to provide wage

statements.

8.  Pre-Judgment Interest

Jiao additionally requests and is entitled to prejudgment interest under the NYLL.

See N.Y. LAB. LAW § 663; Fermin v. Las Delicias Peruanas Rest., Inc., 93 F. Supp. 3d 19, 48

(E.D.N.Y. 2015) ("In contrast to the FLSA, the NYLL permits an award of both liquidated

damages and prejudgment interest.").  "Prejudgment interest is calculated on the unpaid wages

due under the NYLL, not on the liquidated damages awarded under the state law."[15]  Fermin, 93

---

[15] Prejudgment interest is also unavailable for violations of the wage statement or wage notice provisions.  See N.Y. LAB. LAW § 198(1-b), (1-d).

F. Supp. 3d at 49 (quoting <u>Mejia v. East Manor USA Inc.</u>, No. 10 CV 4313, 2013 WL 3023505, at *8 n.11 (E.D.N.Y. Apr. 19, 2013) (internal brackets removed), <u>report and recommendation adopted</u>, 2013 WL 2152176 (E.D.N.Y. May 17, 2013)).

The statutory rate of interest is nine percent per annum.  N.Y. C.P.L.R. § 5004. Where damages were incurred at various times, interest may be calculated from a single reasonable intermediate date.  <u>Id.</u> § 5001(b).  The midpoint of a plaintiff's employment is a reasonable intermediate date for purposes of calculating prejudgment interest.  <u>See</u> <u>Fermin</u>, 93 F. Supp. 3d at 49; <u>Wicaksono</u>, 2011 WL 2022644, at *9.  I determine the midpoint of Jiao's employment to be July 19, 2015.  I therefore respectfully recommend that prejudgment interest at the rate of nine percent per annum be awarded on his wage damages of $50,187 from July 19, 2015 to the date of entry of judgment, which amounts to a per diem interest rate of $12.37 ($50,187 x .09/365).

9. <u>Post-Judgment Interest</u>

Jiao is also entitled to post-judgment interest under 28 U.S.C. § 1961(a).  Section 1961 provides that "interest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  Under the statute, interest is calculated "from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment."  <u>Id.</u>  Thus, I respectfully recommend that Jiao be awarded statutory post-judgment interest.  <u>See</u> <u>Fermin</u>, 93 F. Supp 3d at 53 (finding that post-judgment interest is mandatory).

10. <u>Reimbursement of Motorcycle Costs</u>

Jiao seeks reimbursement for costs associated with the maintenance of a motorcycle, which was used as a delivery vehicle.  Both the FLSA and the NYLL require

employers to reimburse their employees for costs associated with the purchase and maintenance of "tools of the trade," where such expenditures bring the employee's wages below the statutory minimum.  See 29 C.F.R. § 531.35 ("[I]f it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act."); N.Y. COMP. CODES R. & REGS. tit. 12, § 146-2.7(c) ("If an employee must spend money to carry out duties assigned by his or her employer, those expenses must not bring the employee's wage below the required minimum wage."); see also Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 511 (S.D.N.Y. 2010).  "Vehicles such as bicycles, motorcycles, and mopeds are considered 'tools of the trade' if employees are required to possess and utilize them in the course of their employment."  Guan Ming Lin, 755 F. Supp. 2d at 511; see also Yu G. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 257 (S.D.N.Y. 2008) ("There is no question, in light of the record, that vehicular transportation-whether by bicycle or motorbike-was a necessary component of the job of the deliverymen[.] . . . The primary role of these men was to deliver hot meals to hungry and often impatient customers over a large geographic expanse[.]'").

Jiao alleges that defendants required him to maintain a motorcycle for the purpose of making deliveries for the Restaurant, yet did not reimburse him for any out-of-pocket costs associated with the maintenance of that motorcycle, including gasoline costs.  (See Second Am. Compl. ¶¶ 74-75, 111-122; Jiao Aff. ¶¶ 13-14; Tr. at 7:11-17.)  He has also established that he earned less than the minimum wage.  (See Tr. at 6:18-7:6, 9:19-10:12.)  Therefore, I find that he is entitled to reimbursement of his motorcycle costs.

Jiao requests that reimbursement be calculated using the Internal Revenue Service ("IRS") standard mileage rate in lieu of his actual expenses.  (See Second Am. Compl. ¶¶ 117-120.)  Standard reimbursement rates may be used to calculate damages in FLSA cases where a vehicle is a "tool of the trade."  Xin Long Lin v. New Fresca Tortillas, Inc., No. 18 CV 3246, 2019 WL 3716199, at *6 (E.D.N.Y. May 1, 2019), report and recommendation adopted, 2019 WL 3714600 (E.D.N.Y. May 28, 2019) (citing Bordeau v. V & J Emp't Servs., Inc., No. 17 CV 188, 2018 WL 2041617, at *5 (N.D.N.Y. Mar. 27, 2018); Perrin v. Papa John's Int'l, Inc., 114 F. Supp. 3d 707, 721 (E.D. Mo. 2015)).  However, one court in this district recently found usage of the IRS standard mileage rate to be unsupported where the vehicle in question was a motorcycle, given that the IRS rate is intended to approximate "the cost of operating [a] car."  See id.; Internal Revenue Service, *Travel, Gift, and Car Expenses*, Publication 343, at 14-15 (2019), https://www.irs.gov/pub/irs-pdf/p463.pdf.  Instead, that court applied the Motorcycle Reimbursement Rates from the United States General Services Administration ("GSA"), finding that these rates would offer a more reasonable approximation of the plaintiff's costs.  See id.  I agree that the GSA rates would provide a more accurate approximation of Jiao's motorcycle costs, and will therefore apply these rates in my calculations.

Jiao alleges that he drove an average of forty-five miles per day, each day of his employment.  (See Second Am. Compl. ¶ 75.)  From Jiao's date of hire on October 1, 2014 through December 31, 2014, the GSA motorcycle reimbursement rate was $0.53 per mile.  See General Services Administration, Privately Owned Vehicle (POV) Mileage Rates (Archived), https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived.  From January 1, 2015 through December 31, 2015, it was $0.545 per mile.  (See id.)  Finally, from January 1, 2016 through Jiao's date of termination

on May 6, 2016, it was $0.51 per mile.  (See id.)  Therefore, I find that Jiao is entitled to reimbursement for his motorcycle costs in the amount of $2,170.35 for the period from October 1, 2014 through December 31, 2014 (($0.53 x 45 x 7) x 13); $8,583.75 for the period from January 1, 2015 through December 31, 2015 (($0.545 x 45 x 7) x 50); and $2,891.70 for the period from January 1, 2016 through May 6, 2016 (($0.51 x 45 x 7) x 18), for a total of $13,645.80.

### 11. Meal Periods

Jiao also claims that he is entitled to damages for defendants' failure to afford him meal periods pursuant to N.Y. LAB. LAW § 162, which provides that "[a]n employee who works a shift of more than six hours which extends over the noon day meal period is entitled to at least thirty minutes off within that period for the meal period."  (See Second Am. Compl. ¶¶ 123-127.) This claim fails as a matter of law because there is no private right of action under N.Y. LAB. LAW § 162.  See Xin Long Lin, 2019 WL 3716199, at *6; Jihui Zhang v.  XYZ Limousine, Inc., No. 15 CV 7440, 2019 WL 1220310, at *10  (E.D.N.Y. Mar. 15, 2019); see also Hill v. City of New York, 136 F. Supp. 3d 304, 350-51 (E.D.N.Y. 2015) (collecting cases).  Moreover, the calculation of unpaid minimum wages accounted for all hours Jiao worked.  See Xin Long Lin, 2019 WL 3716199, at *6.  Therefore, I find that Jiao is not entitled to additional compensation for unpaid meal breaks.

### 12. Record-Keeping

Jiao further claims that he is entitled to damages for defendants' failure to keep records in compliance with N.Y. COMP. CODES R. & REGS. tit. 12, § 146-2.1.  (See Second Am. Compl. ¶¶ 128-132.)  That provision requires employers to "establish, maintain and preserve for at least six years weekly payroll records[.]"  N.Y. COMP. CODES R. & REGS. tit. 12, § 146-2.1.

Like the claim for failure to provide meal periods, this claim also fails as a matter of law because "no 'independent cause of action' for violations of New York's recordkeeping requirements exists." Xin Long Lin, 2019 WL 3716199, at *6 (quoting In re Domino's Pizza Inc., No. 16 CV 6274, 2018 WL 1587593, at *7 (S.D.N.Y. Mar. 27, 2018)); see also Carter v. Tuttnaeur U.S.A. Co., 78 F. Supp. 3d 564, 571 (E.D.N.Y. January 12, 2015).  Therefore, I find that Jiao is not entitled to damages for record-keeping violations.

        13. Attorney's Fees & Costs

        As a prevailing party, Jiao is entitled to attorney's fees and costs under both statutes.  See 29 U.S.C. § 216(b); N.Y. LAB. LAW §§ 198, 663(1)).  He seeks an award of attorney's fees in the amount of $34,271.17.  (See Attorney Time Records, Dkt. No. 86-4.)

        District courts have "considerable discretion in determining what constitutes reasonable attorney's fees in a given case." Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 151 (2d Cir. 2008).  When exercising their discretion to determine the reasonableness of attorney's fees, courts in this circuit use the "presumptively reasonable fee" standard. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 183, 190 (2d Cir. 2008).  The presumptively reasonable fee, also known as the lodestar, is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).  In addition, an application for attorney's fees must be supported "by accurate, detailed, and contemporaneous time records." Labarbera v. ASTC Labs., Inc., 752 F. Supp. 2d 263, 277 (E.D.N.Y. 2010).

        I begin by assessing whether Jiao's counsel requests a reasonable hourly rate.  A reasonable hourly rate is "the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case

effectively." <u>Arbor Hill</u>, 522 F.3d at 190.  Reasonable hourly rates should be based on "rates prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." <u>Cruz v. Local Union No. 3 of IBEW</u>, 34 F.3d 1148, 1159 (2d Cir. 1994) (citing <u>Blum v. Stenson</u>, 465 U.S. 886, 896 n.11 (1984)).  A judge may determine prevailing rates based on evidence presented or his or her own knowledge of rates charged in the community. <u>Chambless v. Masters, Mates & Pilots Pension Plan</u>, 885 F.2d 1053, 1059 (2d Cir. 1989).  The "community" is generally considered to be the district where the court sits.  <u>See</u> <u>Arbor Hill</u>, 522 F.3d at 190.   Also, "the nature of representation and type of work involved in a case are critical ingredients in determining the 'reasonable' hourly rate." <u>Id.</u> at 184 n.2 (citations omitted).

As a preliminary matter, while counsel has satisfied the contemporaneous time records requirement, I note that little else has been submitted in support of the fee application. The portion of the Memorandum of Law addressing attorney's fees contains a single sentence referencing the fee shifting provisions of the FLSA and NYLL.  (<u>See</u> Pls.' Mem. at 10.)  No information is provided as to the experience and qualifications of the billers; nor is any attempt made to justify the reasonableness of the rates requested.  The papers do not even make clear which billers are attorneys versus non-attorneys, let alone partners versus associates.

I further note that counsel has recently been admonished by another court in this district for submitting time records with no information as to the billers' credentials.  <u>See</u> <u>Ye Hong v. 7 Express Rest. Corp.</u>, No. 17 CV 2174, 2019 WL 2261091, at *8 (E.D.N.Y. Mar. 19, 2019), <u>report and recommendation adopted as modified</u>, 2019 WL 1429584 (E.D.N.Y. Mar. 29, 2019).  While noting that counsel's failure to provide this information "would wholly justify a fee award using the lowest rate of $ 100.00 for counsel of record and assuming that all other

billers are paraprofessionals who should be compensated at lower rates," that court nonetheless recommended an award of fees based on recent cases in this district where that information had been provided.  See id.  At least one other court in this district has taken the same approach when faced with a similarly insufficient fee application.  See Xin Long Lin, 019 WL 3716199, at *9.  I will follow the lead of these courts and look to recent cases to determine reasonable hourly rates for the billers in this case.  Counsel is on notice, however, that fee applications that fail to provide support for the requested hourly rates may be denied in the future.

Counsel requests hourly rates of $550 for partner John Troy, $350 for associates Aaron Schweitzer and George Byun, and $150 for Certified Public Accountant Maggie Huang. (See Attorney Time Records.)  I find these rates to be unreasonably high.  Several recent cases in this district have awarded $375 per hour for Mr. Troy, $150 for Mr. Byun, and $100 per hour for Mr. Schweitzer.  See Xin Long Lin, 19 WL 3716199, at *9; Ye Hong, 2019 WL 2261091, at *8; Li v. W. Metal Work & Supply, Inc., No. 17 CV 1015, 2019 WL 2436275, at *7 (E.D.N.Y. Feb. 27, 2019); Zhong Fa Qin v. Sensation Neo Shanghai Cuisine, Inc., No. 15 CV 6399, 2018 WL 4853041, at *3 (E.D.N.Y. Oct. 4, 2018).  Meanwhile, Ms. Huang's work has recently been compensated at a rate of $75 per hour.  See Ye Hong, 2019 WL 2261091, at *8.  I respectfully recommend that these rates be adopted.

I next look to the reasonableness of the hours billed.  To determine the reasonableness of the hours spent on the litigation, the court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended."  Maldonado v. La Nueva Rampa, Inc., No. 10 CV 8195, 2012 WL 1669341, at *13 (S.D.N.Y. May 14, 2012) (quoting Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994)).  The "critical inquiry is 'whether, at the time the work was performed,

a reasonable attorney would have engaged in similar time expenditures.'" Id. (quoting Grant v.

Martinez, 973 F.2d 96, 99 (2d Cir. 1992)).  The court may exclude those hours that it finds

excessive, redundant, or otherwise unnecessary.  See Gordon v. Site 16/17 Dev., LLC, No. 11

CV 427, 2011 WL 3251520, at *6 (S.D.N.Y. July 28, 2011).  In lieu of an itemized reduction,

the court may make an across-the-board percentage reduction.  See Kirsch v. Fleet Street, Ltd.,

148 F.3d 149, 173 (2d Cir. 1998).

   Here, counsel seeks compensation for 82.71 hours of attorney work (23.30 for Mr.

Troy, 9.58 for Mr. Byun, and 49.83 for Mr. Schweitzer) and 4.41 hours of Ms. Huang's work, for

a total of 87.12 hours.  I find this to be an excessive amount of time for a straightforward FLSA

case in which all defendants defaulted.  See, e.g., Xin Long Lin, 19 WL 3716199, at *9 (finding

57.97 hours to be "grossly excessive" in an FLSA default and applying a twenty percent

reduction in hours); Ye Hong, 2019 WL 2261091, at *8 (finding 94.37 hours to be excessive in

an FLSA default involving six plaintiffs and six defendants, and reducing non-duplicative hours

by one-third); see also Maldonado, 2012 WL 1669341, at *13 (finding fifty-five hours to be "the

high-end" of what is reasonable in an FLSA default).

   I also note that some of the hours reflected in the time records were presumably

spent prosecuting the claims of Guanzhuo Chen and Huang, neither of whom is a prevailing

party.  "When an attorney represents multiple parties and not all prevail, the court need not

categorically reduce the award by the proportion of unsuccessful parties, but should exercise

discretion to reduce the fee to reflect a reasonable amount of time spent on the prevailing party's

case."  Norwood v. Salvatore, No. 12 CV 1025, 2016 WL 1060299, at *6 (N.D.N.Y. Mar. 15,

2016) (citing Adorno v. Port Auth. of N.Y. & N.J., 685 F. Supp. 2d 507, 518 (S.D.N.Y. 2010));

see also Makinen v. City of New York, No. 11 CV 7535, 2019 WL 970945, at *3 (S.D.N.Y. Feb.

28, 2019) (noting the "factual and legal overlap" in the plaintiffs' claims and applying a thirty

percent reduction in hours); Artica v. J.B. Custom Masonry & Concrete, Inc., Nos. 09 CV 3796,

11 CV 0842, 2012 WL 13102524, at *9 (E.D.N.Y. June 4, 2012) (noting that "Plaintiffs' counsel

was devoted significantly to the litigation as a whole, rather than claims of individual Plaintiffs,

rendering a strict proportion reduction inappropriate[,]" and instead applying a fifteen percent

reduction in hours).

   In this case, given the excessive number of hours billed and the fact that only one

plaintiff prevailed, I find a thirty percent across-the-board reduction in hours appropriate and

recommend that Jiao be awarded $10,842.50 in attorney's fees, as follows:

| Name | Hourly Rate | Number of Hours | Total |
|---|---|---|---|
| John Troy | $375 | 16.31 | $6,116.25 |
| George Byun | $150 | 6.71 | $1,006.50 |
| Aaron Schweitzer | $100 | 34.88 | $3,488 |
| Maggie Huang | $75 | 3.09 | $231.75 |
| **TOTAL** | | | **$10,842.50** |

   Jiao additionally requests compensation for $2,179.64 in costs, representing $400

for this court's filing fee, $40 for multiple DMV record searches, $1,720.32 in service of process

fees, and $19.32 for postage.  (See Attorney Time Records.)  The service of process fees appear

to be broken down as follows: $375 for service of the original summons and complaint; $450 for

service of the first amended summons and complaint; $363 for repeated service upon the

corporate defendants due to an earlier defect in service; and $532.32 for service of the second

amended summons and complaint, including two instances of service upon Rice K.  (See id.)

While court filing fees, service of process fees, and postage are routinely recoverable in FLSA cases, see Li, 2019 WL 2436275, at *8, counsel should not be reimbursed for instances of defective service or for service upon defendants against whom Jiao did not prevail, see Lu Nan Fan v. Jenny & Richard's Inc., 17 CV 6963, 2019 WL 1549033, at *16 (E.D.N.Y. Feb. 22, 2019), report and recommendation adopted, 2019 WL 1547256 (E.D.N.Y. Apr. 9, 2019); Hernandez, 2019 WL 643735, at *10.  Accordingly, I respectfully recommend that Jiao be awarded $1,093.20 in service of process fees, broken down as follows: $300 for service of the original summons and complaint; $363 for service of the first amended summons and complaint; and $430.20 for service of the second amended summons and complaint.[16]  I further recommend that Jiao be awarded $400 for the filing fee and $19.32 for postage.  I do not

---

[16] This figure reflects subtraction of the following items: $75 for service on "John Chen" (later identified as Yin Gin Chin) billed on August 13, 2016; $75 each for service on Wong, Rosanna Chin, Shiugeen Chin, Gin, Yuki, and Spring billed on January 2, 2017; and $102.12 for service on Rice K billed on August 27, 2017.  I do not recommend reimbursement for service costs as to Yi Gin Chin, Wong, Rosanna Chin, or Shiugeen Chin because Jiao has not prevailed as to these defendants.  I further do not recommend reimbursement for the service costs as to Gin, Yuki, and Spring that were billed on January 2, 2017, as these items appear to reflect instances of defective service which were later repeated.  (See Staff Note, dated Mar. 19, 2018 ("I called and spoke with Plaintiff's attorney re: the request for certificate of default. I advised Mr. Troy that the service for the corporate defendants does not appear to be proper service as the summonses were affixed to the door and an officer or managing agent was not served. Mr. Troy advised me that he would look into this case and follow up with me"); Affidavits of Service of Dwight Morant, sworn to Dec. 27, 2016, Dkt. Nos. 22-24 (indicating that the summons and complaint were affixed to a door).)  Finally, I do not recommend reimbursement of the service cost as to Rice K billed on August 27, 2018, as it too appears to represent an instance of defective service that was later repeated.  As described supra, initial service of the second amended summons and complaint, which took place in August 2018, was defective as to each of the corporate defendants.  (See Affidavits of Service of Denise Lewis, sworn to Aug. 23, 2018, Dkt. Nos. 62-70; Denial of Request for Certificate of Default, dated Dec. 10, 2018.)  Service on the corporate defendants was repeated in December 2018.  (See Affidavits of Service of Robert Goyette, sworn to Dec. 31, 2018, Dkt. Nos. 74-79.)  For each of the above described instances of defective service on corporate defendants, counsel has double billed for both the defective service and the subsequent proper service.  I have recommended reimbursement only for the proper service.

recommend reimbursement for the DMV record searches, as counsel has not explained the basis of those expenses.

CONCLUSION

For reasons stated above, I respectfully recommend that Jiao's motion for default judgment be granted as to Kitaku, Gin, Yuki, Spring, Luna, Rice K, and Xiu Chen, but denied as to Yi Gin Chin and Wong.  In terms of damages, I recommend that Jiao be awarded $133,874.82, consisting of $29,422.50 in unpaid minimum wage compensation, $15,840 in unpaid overtime compensation, $4,924.50 in unpaid spread of hours wages, $50,187.00 in liquidated damages, $2,500 for wage notice violations, $5,000 for wage statement violations, $13,645.80 for reimbursement of motorcycle costs, $10,842.50 in attorney's fees, and $1,512.52 in costs, plus pre-judgment interest accruing from July 19, 2015 and post-judgment interest.  I further recommend that the claims of Guanzhuo Chen and Huang be dismissed without prejudice.

Any objections to this report and recommendation must be filed with the Clerk of Court, with courtesy copies to Chief Judge Mauskopf and to my chambers, within fourteen (14) days.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(d).

Respectfully submitted,

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
        March 13, 2020